## No. 10,230.

### THOMAS P. LEATHERS VS. ANDREW J. SWEENEY ET AL.

A steamboat builder is liable in damages for defects of construction which occasion loss to the owner.

The measure of damages is the amount of reasonable costs incurred and paid for by the owner, to remedy the defects and to place the boat in a proper condition, as contemplated by the contract.

APPEAL from the Civil District Court for the Parish of Orleans. *Monroe*, J.

*Richard De Gray* and *O. B. Sansum* for Plaintiff and Appellant.

*Howe & Prentiss* and *Singleton, Browne & Choate* for Defendants and Appellees.

---

The opinion of the Court was delivered by

POCHÉ, J. This litigation grows out of a building contract for the

construction of a stern-wheel steamboat for plaintiff by the defendants, who are boat-builders at Wheeling, in the State of West Virginia.

The contract was entered into in March, 1885, and the boat was delivered to the owner in August of the same year.

The cause of action is in the nature of damages flowing from two alleged defects of construction, as follows:

1.  That the boat was imperfectly caulked, in consequence of which she made so much water that in less than three months of service she had to be placed in a dry dock, and recaulked, at an expense to the owner of $1930 37.

2.  That her wheel was set too low, from which cause it had too deep a sweep, much to the detriment of the boat, in consequence of which it had to be re-set so as to be raised higher in order to cure the defect, at a cost to the owner of $330 77.

Plaintiff's demand is for the reimbursement of these two sums, and for the recovery of the additional sum of $1000, as the alleged amount of earnings which the boat would have made during the whole time that she was necessarily kept in dock.

The defense is a general denial, followed by a demand in reconvention for $25,000, as damages suffered by the defendants through plaintiff's malicious charge of defective workmanship in the execution of their contract.

Plaintiff appeals from a judgment rejecting his entire demand, and defendants join in the appeal for the purpose of enforcing their claim for damages.

The record is very voluminous and the testimony is clashing and conflicting. Hence the labor of examination has been very great and exceedingly tedious; especially as our review of the case has led us to a conclusion entirely different from the views which prevailed with our brother of the district court; and which are expressed in an elaborate and able opinion.

I.

The undisputed salient facts on the first point of contention are as follows: The boat was delivered in apparent good condition, and was accepted and paid for by plaintiff in August, 1885, at which time she was put into service in the Vicksburg trade. After making eight regular or weekly trips, and two extra trips, she was found to make so much water that it became urgent and necessary to have her docked and recaulked. On examination in the dock it was discovered that she leaked in many places, through her seams and butts, that there was an

insufficient quantity of oakum in both seams and butts, and hence it was concluded that she needed recaulking. The work was accordingly done, for which some 700 pounds of oakum were used.

From that state of things it appears, and it is not disputed, that the leaks in the hull of the boat were the result of an insufficient quantity of oakum in the seams at that time.

At this point arises the vital contention between the parties on this branch of the case, and of course, it is on this particular point that the testimony is most conflicting.

Plaintiff's theory is that the defect can, and must be attributed, solely to insufficient caulking for the lack of oakum. Defendants, on the other hand, contend that the leaky condition of the hull is the result of ill-usage, bad management, and of injuries occasioned to the boat by two "hard landings" at which the boat struck the river bank with great and unusual force; and they urge that the caulking was done properly and efficiently, with a large and sufficient quantity of the best "navy oakum" to be found on the market.

In the concurrent opinion of numerous experts, such as owners of dry docks in this city, steamboat captains, boat-builders, ship-carpenters and caulkers, neither of whom has any interest, direct or remote, in the determination of this suit, it appears conclusively that a Mississippi river steamboat, plying between New Orleans and Vicksburg, originally well built and properly and sufficiently caulked, should not require re-caulking before at least two years of service.

It is in proof that several of the most useful and magnificent river steamers, which once adorned the port of New Orleans, such as the "Robert E. Lee," the "J. M. White," the "Ed. Richardson," the "Frank Pargoud," and the "Natchez," ran from four to six years after construction without being recaulked.

And in this case, we have to deal with a boat, built for the same trade or service, shown to have been staunchly constructed, and well finished; and the question is to account for the fact that in less than three months' service, she leaked so badly that she had to be docked and recaulked "all over."

Is the reason to be found in the alleged ill-usage or in the two "hard landings?"

To our minds the preponderance of the evidence does not sustain that theory.

The first of these alleged "hard landings" took place on her third trip, and she continued on her journey, without interruption, and without making more water than she had done before. In point of fact,

only one witness in the whole record testifies on that point, or attempts to trace any damaging result to that incident; and no stress is laid on the question on appeal.

The other alleged damaging accident occurred on the down run of her ninth trip which preceded the last trip which she made before going into dock.

On that point, the preponderance of the evidence shows that the collision of the boat with the soft muddy bank of the river was severe, and that it was due to an accident caused by the breaking of a bell-wire, in consequence of which the pilot was unable to signal the engineer to back the boat in time to check her headway. But it does not show that the boat was seriously damaged thereby, or that she sprung any dangerous leak in consequence thereof. She was leaking before, she continued to leak after the collision; her pumps to draw up and throw off the water which she was making, had been at work before, and continued after the accident.

Some of the witnesses, who were then employed on the boat, and have since left her service, treat this accident as a very serious and damaging affair, while others treat it very lightly.

The fact that the boat continued on her journey to this city, a distance of 250 miles, with a cargo equal to the weight of 2500 bales of cotton; that on the next day after her arrival, she left on a round trip, which she made successfully, with a heavy freight, speaks louder and more pointedly than the language of witnesses. It shows to our satisfaction that the boat had not been seriously damaged by the accident; and we conclude on this point that neither of the two alleged hard landings afford a rational explanation of the leaky condition of the boat in consequence of which she needed to be recaulked "all over.".

It is in proof that when docked in November, 1885, the boat showed numerous leaks, scattered over the hull generally, and not concentrated in any particular spot; and her seams and butts showed general openings, not confined within any particular parts or portions of the hull.

That condition of things shows, in the opinion of experts, that the leaks could not have been occasioned by the collisions in question, for if that had been the case, those portions of the hull only, which had received the strain or injury, would have contained open or crooked seams or butts. It is also in proof, without any attempt at contradiction by the defendants, that when docked, the boat showed no signs of hard usage; her bottom was smooth and even, and her seams were natural in appearance and straight, without a scratch, a notch or a bump. And

that condition of the hull is proof, in the opinion of experts, that the boat had not been damaged by bad management or ill-usage.

And yet the proof is that she made so much water that recaulking became an urgent necessity. The testimony of all the experts is to the effect that in the absence of hard usage, or of serious, if not fatal, accidents, the oakum properly applied to the seams of a river steamboat could not, in the short space of three months, have been knocked out, or (as they term it) "*spewed out*" of the seams and butts of the boat. Hence, in the face of testimony showing that the oakum was soft and insufficient in quantity in the seams of the hull, at the time that the boat was put in dock, the experts uniformly exclaim: "A sufficient quantity of oakum was not put in at the original caulking."

It appears from the record that the defendants did not retain the immediate control over the entire construction and outfit of the boat, but that the contract to build the hull was sublet by them to another firm of boat builders, and that the contract for the caulking of the hull was given by the latter to four other parties who make caulking a specialty.

The record contains the testimony of one of the defendants who was present in court, and that of the superintendent of the sub-contractors, of the caulkers, and of their employes and laborers, taken under commissions; and they all testify with vigorous unanimity that the caulking was done in workmanlike manner and almost to perfection. The statement is made by several of these witnesses that 2000 pounds of the best " navy oakum" were actually used, and securely forced into the seams of the new boat. Assuming these various statements to be proven facts, the learned district judge holds that plaintiff's witnesses must be mistaken in their testimony, which is to the effect that with 685 pounds of oakum the boat was recaulked all over in the "Vallette Dry Dock," especially as in the " Marine Dry Dock," two years later, it took 400 pounds to put one thread of okum in the seams of her bottom. Hence he concludes that the record utterly fails to show that the original caulking was in any way defective or insufficient. He concedes, however, and in that we agree with him, that the quantity of oakum used is not, after all, the absolute test of the efficiency of the caulking.

But, be that as it may, we find from that combination of circumstances, a consideration which affords to our minds a solution of the problem under discussion.

It is either true or not that 2000 pounds of oakum were used in the caulking at the defendants' ways; and it may be true or not that with 685 pounds of oakum the work claimed by plaintiff's witnesses was done to the boat in November, 1885. Now it is undeniable that with the

caulking done under defendants' contract, the boat became so leaky as to be dangerous or useless in less than three months' service; and it is in proof that with the recaulking as done in the "Vallette Dry Dock," the boat was actually used, in her regular trade, for *two years* before she needed any recaulking, and that when she was recaulked she only received 400 pounds of oakum. And the record shows that during those two years, during which she made no water, she was under the control of the same management (be it good or bad) which had run her from September to November, 1885, and to whose "*inexperience and reckless-ness*" defendants attribute all the calamities which had befallen the boat during her incipient career.

In the detailed bill of the "Vallette Dock" plaintiff is charged with only 685 pounds of oakum, and it is absolutely safe to conclude that a greater quantity was not used. As the caulking originally done was included in the cost price of the boat, no detailed charge is made for the oakum therein used. But the quantity used by Vallette was sufficient to restore the boat to a perfectly dry and tight condition from the admittedly leaky and dangerous condition in which she entered the dock, on November 14, 1885, and as it proved that the caulking thus done lasted for two years's service *under the same management*, the conclusion is irresistible that the original caulking, which lasted only three months, must have been defective, either because it had been improperly done, or because a sufficient quantity of oakum was not used in the work.

For the purposes of the case it is perhaps unnecessary for us to announce which of those two conclusions was forced on our minds by the record.

But under our finding that the expenses of the recaulking were necessitated by the defective original caulking, the requirements of the law and the ends of justice apply the legal consequence flowing therefrom, and that is the liability of defendants under their contract to reimburse the expenditure thus incurred by plaintiff.

Hence he must recover judgment for the sum of $1930 77, which is the amount of the detailed bill of the dock company for that work, and over which there is no dispute beyond the point which we have just discussed.

II.

Our review of the case has led us to the conclusion that plaintiff's complaint about the wheel is also sustained by the preponderance of the evidence.

The written contract was silent as to the dimensions and other details concerning the wheel. It was subsequently agreed between the parties

that the wheel was to be of a diameter of 23 feet, but a discussion arose as to the proper height of hanging the wheel so as to• regulate the sweep thereof in the water.   Both parties agreed that the wheel should have a dip of three inches above the level of the bottom of the boat.

But from the plans and drawings submitted to Captain Leathers by the builders, it appeared to him·from the location of the cylinder timbers that the proper dimensions were not given to obtain the desired result; and that as located in the plan the wheel would be lower than the bottom of the boat; that therefore it would be too deep in the water, and that in consequence the wheel would drive the boat with a force not commensurate with the power of the engine, or with the general build, frame and strength of the boat.   These objections were urged here and also at the defendants' ways on both occasions when plaintiff visited them and saw the boat in progress of construction.   And owing doubtless to the subsequent illness of Captain Leathers, which lasted until the month of September following, the point of contention, as above stated, was never definitely settled between the parties.

From the testimony of J. M. Sweeney, one of the defendants in the case, it appears that he considered the point as settled, in accordance with his views, as .detailed in the plans and drawings.   He refers to a steamboat constructed in a similar manner, on which he took a trip with Captain Leathers, making full explanations on the subject, after which the latter yielded his consent to the mode suggested by the builders.

But in thus concluding, Mr. Sweeney .made an honest mistake, as it appears conclusively from other parts of the record, that the idea was never finally accepted by Captain Leathers.

Being too unwell to attend to the business, he sent a trusted agent, a skilled engineer, to Wheeling, with the special mission of superintending the machinery for the new boat.   After making necessary measurements, that engineer discovered the identical discrepancy which had hitherto concerned Captain Leathers, as to the height at which the wheel should be set; and he accordingly protested against the course which defendants had adopted on the subject-matter.   As his objections were not heeded, he telegraphed to Captain Leathers, conveying the facts in the premises, and submitting his opinion, whereupon a letter was written to the defendants, by the commercial agents of Leathers in this city, communicating his instructions and wishes of the latter on the subject.   Nevertheless the wheel was set in accordance with the plans of the defendants.   It is also in proof, through the testimony of Sweeney himself, that on the occasion ·of Leathers' inspection of the boat at the wharf in this city, the latter had made the remark that " he

would give $500 if that wheel was higher, but he supposed it was all right."

We therefore conclude that the evidence is not sufficient to commit Leathers to the mode adopted by the defendants, in hanging the wheel, and that they followed their own idea in the premises, at their own risk.

Now, from the testimony of numerous experts, who saw and inspected the boat, in the "Vallette Dock," it is shown beyond the peradventure of a doubt that the wheel was then from seven to ten inches below the bottom level of the boat, and that this was a mistake of construction. The wheel was then raised eleven or twelve inches by means of the proper appliances, and that operation gave to it the proper sweep or dip, which is three inches above the level of the bottom of the boat.

The propriety and the necessity of the change thus made were verified by subsequent events. On inspection of the boat, when she was docked two years later, it was found by the experts that the wheel was yet properly hanging. That circumstance affords an answer to the argument made by defendants, that the fact of the wheel hanging too low in November, 1885, was due to the "hogging" of the boat by the bending down of its stern. After two years' service the wheel was found at the proper height or thereabouts, although the stern did then appear to have dropped down a few inches. Conceding that the stern had dropped at the time that she was docked in November, 1885, a fact which is advanced by a few witnesses, and denied by more, and by the most competent experts, it is not even contended that it had dropped one foot; and that much was necessary to produce the result shown by the examination made at that time. It is conceded on all sides that the boat had been previously very efficiently chained, with the best known appliances, and that the hog-chains showed no signs of having given way.

Defendants could not have contended, without involving themselves in a damaging admission of a defective construction of the boat that her stern had dropped lower in three months, than it did subsequently in two years.

The record shows that the boat was taken down the Ohio river during a low stage of water; that she was grounded once for more than thirty hours, and that she several times rubbed or scraped the bottom of the river, for want of sufficient water to properly float her.

From that circumstance it is argued by defendants' counsel that the wheel could not have been lower than the bottom of the boat, as in that case it would have been broken off. To that effect is the testimony of several experts. But by the testimony of one of the pilots who had charge of the boat from Cincinnati to New Orleans, and who was a wit-

ness for defendants, it appears that as often as the boat scraped the ground, the wheel was imbedded in the ground, and that on such occasions, in his own language, "the wheel walked the bottom." But the wheel was not torn off or injured, and that fact, although incompatible with the opinion of experts examined on behalf of the defendants, is satisfactorily explained by the following significant circumstance: The defendant, J. M. Sweeney, states that after passing Louisville, Kentucky, he caused the buckets of the wheel to be shifted several inches, by raising them on the arms, and thus the buckets of the wheel did not come in contact with the ground when the boat scraped the bottom; the arms alone struck the ground which yielded to the pressure of the same, which are strong upright beams or pieces of the best timber; and thus the wheel was enabled to "walk the bottom" without injury.

In that connection Mr. Sweeney states that unless the buckets had been thus shifted, the wheel would have driven the boat with too much force.

That was precisely the ground of plaintiff's objection to defendants' manner of setting the wheel, and that is precisely the theory which necessitated the change made under plaintiff's directions, and under which defendants must be held liable for an honest but unfortunate mistake of construction. The cost of that necessary improvement was $330 77, and plaintiff is entitled to the recovery thereof in this suit.

But he is not entitled to recover any compensation from these defendants for the earnings which the boat could have made while she was in dock.

The record shows that plaintiff then owned another steamer which was forthwith put in the trade in the place of the "T. P. Leathers," the name of the new boat; hence his business did not suffer by that incident.

The chances of his trade were not materially affected by the change from the "Leathers" to the "Natchez."

Instead of keeping the "Natchez" laid up, he simply laid up the "Leathers" for two weeks, and the business was carried on all the same.

In concluding to hold the defendants liable for the two errors in construction which we have labored to describe herein, we are not to be understood as casting the least reflection on either their good faith or their competency as boat-builders; for we leave the record with the absolute conviction that they are not wanting in either. As to the deficient caulking, they were deceived themselves by sub-contractors, and as to the defect touching the wheel, it was the result of a mistake.

Under the views which we have taken of the case, it is unnecessary

to consider the reconventional demand, which falls under its own weight.

It is therefore ordered that the judgment appealed from be annulled, avoided and reversed, and it is now ordered, adjudged and decreed that plaintiff do have and recover judgment against the defendants in the sum of two thousand two hundred and sixty-one dollars and fourteen cents ($2261 14), and that defendant's demand in reconvention be rejected. It is further ordered that plaintiff recover all costs incurred in both courts.